THOMPSON, J.
 

 The issue presented in this case is the constitutionality and .legality of an ordinance of the commission council of the city of Baton Rouge, adopted February 25, 1924, and as amended August 12, 1924.
 

 The original ordinance provides for the establishment and regulation of private meat markets, and section 6 declares that such markets shall be subject to the inspection of the health authorities, whose duty it is to inspect the same and report any violation.
 

 Section 6, as amended, provides that all private meat 'markets shall be established and operated subject to the regulations adopted by the city board of health, after approval of the commission, and shall be regularly inspected by inspectors of the city to see that all such regulations are being complied with and all of the laws and ordinances applicable to such markets are being enforced, the costs of such inspections to be paid by the owner or operator of said markets.
 

 The fees for inspection are fixed as follows:
 

 For every head of large-horned cattle, 50 cents; for every veal, venison, mutton, and pork, 20 cents; a pork weighing 15 pounds or less, 10 cents. The fees were required to be paid to the market collector daily.
 

 The defendant owned and operated a private meat market under a license or permit for the last four months of 1924, and the fees assessed against him in accordance with the schedule amounted tó $146.45.
 

 He refused to pay said amount when and as demanded of him, and this suit to recover the same was instituted.
 

 There is no dispute as to the amount claimed.
 

 The defense is an attack on the constitutionality and legality of the ordinance under which the fees are sought to be imposed: First, because the city had no right or authority to pass the ordinance, for the reason that said fees must be construed either as a license or a tax; that, if a license, the ordinance is violative of section 8, art. 10, of Constitution 1921, in that it exacts a greater license than is imposed for state purposes.
 

 That, if the assessment is a tax, then the ordinance violates section 12 of article 14 of the Constitution, in that the fees exceed the maximum limit as provided by said Constitution.
 

 Second, that, if the said ordinance is not illegal and unconstitutional for the reasons stated, then the fees levied are arbitrary, excessive and exorbitant and in no way related to the cost of inspection, but are in restraint of trade, and an attempt on the part of the city to raise revenue under the guise of the police power.
 

 Section 20 of Act No. 169 of 1898 provides that the council of the city of Baton Rouge shall have power to enact all ordinances necessary for the general welfare of said corporation and the inhabitants thereof, and to provide for the inspection of premises, and to regulate the location, inspection, and cleanliness of all, * * * markets, which may be or become detrimental to health.
 

 In 1924 (Act No. 17) the section" just referred to was amended so as to specially authorize the city of Baton Rouge to establish and regulate public and private markets and to let out the same, to provide for their regu
 
 *323
 
 lation and inspection^ and to fix fees for the costs of said regulation and inspection.
 

 It will' ¿bus appear that under the legislative charter the city of Baton Rouge has full and complete authority in the matter of establishing and regulating private markets and to impose on the owner or operator a charge to cover the cost of regulation and inspection.
 

 It is equally clear that the municipality under the Constitution is authorized to levy a license tax or fee on keepers of a private market, for general revenue purposes, provided that such license shall not exceed the license imposed by the state for state purposes. Sections 5 and 8, art. 10, Constitution of 1921.
 

 • Whether the city can impose at the same time, both a license for revenue and a' license to cover costs or expense of regulation and inspection of the markets, is not necessary here to decide, since the fee levied is either for the one or the other purpose.
 

 It follows therefore from what has been said that the contention that the city of Baton Rouge is without authority and power to pass an ordinance for the regulation and inspection of private markets and to levy a license or fee either for revenue or to cover costs of regulation and inspection is altogether untenable.
 

 The real and pivotal question in the case is whether the ordinance levying the fees was designed to secure sufficient funds
 
 to meet
 
 the cost of regulation and inspection of the markets, or whether the fees levied are so excessive and unreasonable as to stamp the ordinance as a disguised attempt to secure a revenue to support the expenses of the city board of health.
 

 There is a marked and well-recognized distinction between the power conferred on a municipal corporation to levy a tax or license for revenue, and the power to impose a charge or- fee to meet the cost and expense of regulation and inspection of a local public utility.
 

 In the one case the municipality exercises the delegated power of taxation and in the other its police power.
 

 .In the case of Delcambre v. Clere,
 
 34
 
 La. Ann. 1050, this court said:
 

 “There is a recognized distinction between the taxing power and the police power, conferred on corporations; licenses or taxes may be imposed on certain branches as a regulation under the exercise of the latter power, but it must, plainly appear that they are imposed strictly * * * in aid of such power, and not for the purposes of revenue.”
 

 And in Cyc. vol. 25, p. 611, it is said:
 

 “But whenever it is manifest that the amount of such tax imposed in the exercise of police power is substantially in excess of the reasonable expense of issuing a license and of regulating the occupation to which it pertains, or is virtually prohibitive, the act or ordinance imposing the tax is invalid.”
 

 In the case of Mestayer v. Corrige, 38 La. Ann. 707, an ordinance of the town of New Iberia similar to the one here involved was at issue, and the question propounded was whether the rates, charges, and fees sought to be collected and authorized by the statute and ordinance complained of were, in the nature of a tax or license, granted under the taxing power of the state; or constituted a contribution sought to be raised in the exercise of the police power of the state, delegated by statute to the city of New Iberia.
 

 This court, in aflh’ming a judgment which declared the ordinance illegal, said:
 

 “After a careful review of all the authorities c-ited and others at hand, we have reached the conclusion that all of the exactions demanded are 'within the terms ‘tax’ and ‘license,’ and that same were manifestly intended by the mayor and trustees of the city of New Iberia to constitute a source of revenue under the apparent exercise of delegated police power, and that said statute and ordinance are unconstitutional, null and void.”
 

 The evidence in the instant case shows that the fees and charges assessed against the de
 
 *325
 
 fendant, on a per annum basis, were far in excess of all of his state and parish taxes and licenses.
 

 In 1922 the total amount of defendant’s state licenses was $90, and the ad valorem taxes, state, parish, and city, were $140.13, whereas the market fees assessed against defendant, being at that time the same as now demanded, amounted to $578.25.
 

 A like situation prevailed for the years 1923 and 1924.
 

 The market fees were in addition to the abattoir fees paid by the defendant for ante mortem and post mortem inspection and for slaughtering, refrigerating, and delivery of the animals to his market. These fees were for 1922, $3,737.75, for 1923, $3,577.82, and for 1924, $2,761.50.
 

 On the basis of the amount demanded for the last four months of 1924, and assuming that the defendant handled the same number of animals during the other eight months, the license fees for that year would have amounted to $439.35 or $36.60 per month, practically double the amount paid for state license and state, parish, and city taxes.
 

 It is shown that for the years 1922, 1923, and 1924 there were in the city an average of between 25 and 30 private markets. Taking-the lowest number, and assuming that each of the other 24 markets handled only one-half as many carcasses as the defendant, then the- aggregate amount of revenue derived from the private markets annually would be $5,711.43 — more than one-half of the entire annual expenditures of the city' board of health.
 

 This may be said to be an erroneous and unreasonable assumption, but it was within the power of the plaintiff to show definitely what the actual fees assessed against the markets for 1924 and the actual amount collected were. It does appear that for the year 1922 the gross sum of $5,756.75 was actually collected from all of the markets in the city, and that the amount collected or as-1 sessed for the year 1923 was approximately the same as that for 1922.
 

 The total expenditures of the city board of health for 1924, including officers’ salaries and all other outlays, amounted to $10,300, or approximately $1,200 less than double the estimated gross revenue from the meat markets.
 

 It is shown that all of the health matters, including inspection work, are under the control and supervision of the city board of health. There are no separate or special meat market inspectors. These inspections are made by the general inspectors of the health board indifferently, when and as called upon. As said by one of them, “No man has any particular work to do, but everybody works on what needs .attention most.”
 

 Mr. Wallace, sanitary inspector for the health board, testified that a competent man at a salary of $1,800 per year could do all of the inspection work of the meat markets, and Mr. Baltz, another inspector, testified substantially to the same effect.
 

 The markets have not been inspected daily, but at irregular periods — some times once a week, then once in two weeks, and at times not more than once in a month.
 

 . The only reasonable conclusion that can be drawn from the evidence is that the..fees levied and exacted of the markets greatly exceed the amount necessary to cover the cost of proper regulation and inspection, and that such fees have been and aye a source of revenue going to the support of the general expenses of the city board of health.
 

 It is perfectly obvious that in fixing the fees the commission council did not take into consideration the question of regulation and inspection of the meat markets. The fees are levied and collected, or are supposed to be, daily on each animal placed in the market, without reference to inspection. The fees are the same as have been levied and collected for the last 50 years.
 

 It is true that Mr. Ricaud, city commis
 
 *327
 
 sioner of finance, testified that the market fees are not revenue producers and have never been looked upon as such.
 

 When asked if the fees produced sufficient money to take care of the costs of inspection, he said that he did not think so. This, however, was evidently a mere impression of the witness, and based perhaps on a general lack of sufficient revenues to meet the general expenses of the board of, health.
 

 He states that no separate accounts are kept of the costs and expenses pertaining to the public and private markets from that of the other expenses of the board of health; that it would be difficult and practically impossible to apportion the costs to the various duties of the health board as to any separate department or activity.
 

 The commission council, in the exercise of its police power, is unquestionably vested with a very wide discretion in levying charges to cover the necessary expense of regulating and inspecting the markets.
 

 The levy has to be made in advance, and any amount fixed would at most and necessarily be an estimate or an approximation. It would be impossible to say what the'exact amount required would be.
 

 We would not be disposed to interfere with the exercise of the discretion vested in the council and to declare the ordinance illegal, if it was made to appear that the fees demanded were for regulatory and inspection purposes, even though the city did incidentally derive a small revenue from such fees over and beyond the amount required to cover the cost and expense incident to'the regulation and inspection of the markets.
 

 But the fees exacted under the ordinance are so patently out of proportion to, and so obviously in excess of, the amount necessary to meet the expense and cost of the service contemplated, that wé are constrained to hold that the city went beyond its police power of regulation and that the exactions demanded constitute a source of revenue, are within the term “license or tax,” and exceed the constitutional limitation.
 

 The case is not analogous to that of City of New Orleans v. Hop Lee, 104 La. 602, 29 So. 214.
 

 In that case it was held that a' fee of 25 cents, imposed upon the proprietors of laundries to meet the cost of a weekly inspection, was neither a tax nor the imposition of a license for revenue purposes. ■
 

 There is a very wide difference between a weekly inspection fee of 25 cents per laundry and the daily fees on various animals ranging from 10 cents to 50 cents per head for inspection of markets which are not required to be inspected at any fixed period, and which as a fact are never inspected on an average of more than once or twice a month.
 

 For the reasons assigned, the judgment appealed from is reversed and set aside, the demand of-the plaintiff rejected, and the ordinance here in contest is annulled, in so far as it attempts to impose the stated fees on the private meat markets of the city of Baton Rouge.
 

 All costs to be paid by plaintiff.